NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

TRACEY HUGHES, *et al.*,

    Plaintiff,

v.

PATRICIA LAWRENCE KOLARAS, *et al.*,

    Defendants.

Civil Action No. 13-0057 (JAP)

**OPINION**

PISANO, District Judge

Pending before the Court is Patricia Kolaras, The Rum Cake Fairy Dessert Company, LLC, a New Jersey Limited Liability Company, and The PLK Law Group's (Collectively "Defendants") Motion to Dismiss Pursuant to Arbitration Agreement [docket # 6]. Plaintiffs Tracey Hughes and the Rum Cake Fairy Dessert Company, LLC, a New York Limited Liability Company (collectively "Plaintiff") oppose this motion [docket # 9]. The Court has considered the parties' submissions and now decides this motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' Motion to Dismiss is DENIED without prejudice.

**I.    BACKGROUND**

    **A. Introduction**

Plaintiffs Tracey Hughes and The Rum Cake Fairy Dessert Company, LLC, a New York Limited Liability Company ("NJRCF"), bring this against Defendants Patricia Lawrence Kolaras, The Rum Cake Fairy Dessert, LLC, a New Jersey Limited Liability Company

1

("NJRCF"), and the PLK Law Group ("PLK"), alleging claims arising out of a business arrangement entered into by Plaintiff and Ms. Kolaras for the sale and distribution of "Rum Cake Fairy" desserts. Plaintiffs allege claims for professional malpractice and breach of fiduciary duty, federal trademark counterfeiting and infringement, unfair competition and false designation of origin, false advertising, common law trademark infringement and unfair competition, statutory unfair competition, common law right of publicity and privacy, and unjust enrichment.

Defendants filed a motion to dismiss, alleging that an agreement signed by both parties, titled "Rum Cake Fairy Dessert Company Agreement" ("RCF Agreement") contains the following arbitration clause:

> "It is hereby agreed by both members that this agreement has been entered into in the state of New Jersey, and the validity, interpretation and legal effect shall be governed by the applicable law and any action or dispute arising from this agreement shall be brought to and settled by arbitration in accordance with the rules of the American Arbitration Association, and such determination shall be final and binding. In the event it becomes necessary to enforce this agreement, the non-prevailing member shall pay all arbitration fees and other such costs associated therewith."

**B. Facts**

Beginning in 1994, Plaintiff developed and sold rum cakes under the name "Rum Cake Fairy." Compl. ¶¶ 11-12. Plaintiff claims that between 1999 and 2005, she developed a "successful part-time business" selling rum cakes, and in December 2005, formed the New York Rum Cake Fairy Company. *Id.* ¶¶ 13-15. According to Plaintiff, in 2006, as her brand began to gain national recognition, she received a phone call from Defendant Patricia Kolaras, a college acquaintance, whom Plaintiff had not recently been in contact with. *Id.* ¶ 20.  According to

Plaintiff, Ms. Kolaras had learned of Rum Cake Fairy's success and called to congratulate Plaintiff and offer services as an intellectual property and transactional lawyer. *Id.* ¶ 20.

Prior to speaking with Ms. Kolaras, Plaintiff had filed, *pro se*, a United States Trademark Application for "The Rum Cake Fairy."[1] *Id.* ¶ 22. Plaintiff's Application was denied by the United States Patent and Trademark Office ("USTPO") on November 6, 2006. *Id.* Plaintiff then sought assistance from Ms. Kolaras and PLK to prosecute the application.[2] *Id.* According to Plaintiff, Ms. Kolaras and PLK presented her with an "engagement agreement" when they began assisting her with her trademark application. *Id.* ¶ 23. However, Plaintiff claims the "engagement agreement" was never executed because "[Ms.] Kolaras and PLK subsequently agreed, verbally, to provide their services to Plaintiff in exchange for a General Counsel position" with NYRCF.[3] *Id.*

Ms. Kolaras and PLK prepared and filed, on Plaintiff's behalf, a response to the refusal of Plaintiff's initial trademark application. *Id.* ¶ 24. The amended application changed the ownership information, listing "New York Rum Cake Fairy" as the applicant, and designated the United States as the "state" where the legal entity applicant was organized. *Id.* According to Plaintiff, the designation of the United States as the state where Rum Cake Fairy was organized resulted in the denial of the amended application on April 16, 2006. *Id.* Following its rejection, the trademark application was deemed abandoned for failure to file a timely response. *Id.* ¶ 25. On November 21, 2007, Ms. Kolaras and PLK filed a Petition to Revive the Application and a

---

[1] Trademark Serial No. 78842190 stating that "Applicant, Tracey D. Hughes, was a limited liability company, organized and existing under the laws of the state of New York." Compl. ¶ 22.
[2] Plaintiff claims she did not have a prior business relationship with Ms. Kolaras or PLK and sought their assistance in filing a trademark application based on Plaintiff's past relationship with Ms. Kolaras and "representations made by [Ms] Kolaras concerning her profession and field of expertise." *Id.* ¶ 23.
[3] According to Plaintiff, while preparing for a television interview featuring the Rum Cake Fairy on MSNBC's *Your Business*, she was advised by Ms. Kolaras to state during the interview that they had a written agreement documenting their business arrangement, because Ms. Kolaras thought "it would look bad for an attorney and a business owner to not have a written agreement." *Id.* ¶ 32.

response to the denial, amending the legal citizenship information to identify New Jersey as the state of organization. *Id.* According to Plaintiff, NYRCF is and always has been a New York company. *Id.* The trademark application, with allegedly inaccurate citizenship information, published for opposition on or about May 20, 2008, and the applied-for Mark and Design, the Rum Cake Fairy, registered on August 5, 2008.[4] *Id.* ¶ 26.

Following the registration of the Rum Cake Fairy trademark, Plaintiff alleges that Ms. Kolaras, without Plaintiff's knowledge or consent, purchased the domain name "www.rumcakefairy.com" and recorded an Assignment of Trademark with the USTPO on December 22, 2008, which transferred ownership of the NYRCF Registration to Ms. Kolaras. *Id.* ¶¶ 54-5. Plaintiff claims she never consented in writing to Ms. Kolaras acquiring any ownership interest in NYRCF and no written agreement outlining the terms by which Ms. Kolaras would acquire any ownership interest was ever executed. *Id.* ¶ 29. According to Plaintiff, the Registration is owned by NYRCF, thereby rendering void the transfer of the Registration signed by Ms. Kolaras in her capacity as President of NJRCF.[5] *Id.* ¶¶ 55-7.

As NYRCF's business grew, Plaintiff claims she was facing many business challenges and turned to Ms. Kolaras and PLK for legal advice and assistance in negotiating and securing corporate accounts. *Id.* ¶ 27. In September 2007, Ms. Kolaras and PLK introduced Plaintiff to one of PLK's other clients to test run a franchising proposal for the Rum Cake Fairy in a New Jersey mall (the "New Jersey Mall Deal").[6] According to Plaintiff, she was advised by Ms. Kolaras to form a New Jersey limited liability company specifically for the New Jersey Mall Deal because NYRCF was "carrying too much debt." ¶ 37. Plaintiff agreed and Ms. Kolaras

---

[4] Trademark Registration No. 3480651. *Id.* ¶ 26.
[5] According to Plaintiff, Title to the Registration has been corrected to reflect its rightful owner, NYRCF. *Id.* ¶ 57.
[6] Plaintiff claims that Ms. Kolaras and PLK represented both parties in the New Jersey Mall Deal and rushed Plaintiff into signing several agreements without giving her the opportunity for thorough review. *Id.* ¶ 36.

4

formed the New Jersey Rum Cake Fairy ("NJRCF") as a New Jersey Limited Liability Company, designating Plaintiff and Ms. Kolaras as the only members. *Id.* ¶ 37.

In October 2007, Plaintiff claims Ms. Kolaras opened a bank account for NJRCF with an initial investment from an investor.[7] *Id.* ¶ 38. According to Plaintiff, by February of 2009, both NYRCF and NJRCF were generating minimal revenue and carrying approximately $320,000 in debt. *Id.* ¶ 39. Plaintiff alleges she could no longer fulfill her obligations to creditors and Plaintiff's bankruptcy counsel advised her to file for personal bankruptcy protection and consolidate NYRCF's and NJRCF's debts into her personal bankruptcy. *Id.* ¶ 40. In May of 2009, Plaintiff commenced Chapter 7 bankruptcy proceedings, individually and on behalf of NYRCF and NJRCF, and all debts were successfully discharged on January 26, 2010.[8] *Id.* ¶ 42. Following her bankruptcy, Plaintiff alleges that she was advised by Ms. Kolaras and PLK to form a successor company under Ms. Kolaras' name to continue the business with minimal involvement from Plaintiff to avoid creditors, which Plaintiff agreed to consider. *Id.* ¶¶ 43-4. On April, 14, 2009, Ms. Kolaras and PLK registered a new company, Rum Cake Fairy Cakes ("RCFC"), with the New Jersey Secretary of State as a limited liability company.[9] *Id.* ¶ 44.

Plaintiff subsequently began to question her business relationship with Ms. Kolaras, and on September 11, 2009, Plaintiff met with Ms. Kolaras at PLK's office, and informed Ms. Kolaras that she wanted to end their business arrangement and was not interested in forming a new company. *Id.* ¶¶ 48-9. Plaintiff claims she demanded Defendants permanently refrain from the use of the RCF Marks and trade name, and requested a bill for any outstanding fees from Ms.

---

[7] Plaintiff alleges Ms. Kolaras withdrew $4,350 from NJRCF's business account between December, 2008 and June, 2009 without Plaintiff's knowledge. *Id.* ¶ 38.
[8] Plaintiff claims her entire personal and retirement savings were depleted and Ms. Kolaras avoided any liability. *Id.* ¶ 43.
[9] No officers, directors, or members were identified in RCFC's registration. *Id.* ¶ 45.

5

Kolaras and PLK.[10] *Id.* ¶¶ 48-50. Plaintiff and Ms. Kolaras had another meeting on September 30, 2009, during which Plaintiff claims Ms. Kolaras mentioned the RCF Agreement for the first time.[11] *Id.* ¶ 51-2. Ms. Kolaras informed Plaintiff that pursuant to the alleged RCF Agreement, Plaintiff would not be able to continue the Rum Cake Fairy business because all of the company's assets, including the RCF Marks and recipe, were owned by NJRCF. *Id.* ¶ 52.

Defendants allege that Plaintiff and Ms. Kolaras signed an agreement, dated October 31, 2007, outlining their business arrangement. Kolaras Cert. Ex. A. In addition to containing the previously mentioned arbitration clause, the RCF Agreement purports to do several things. First, the agreement includes Plaintiff's alleged acknowledgement and approval of the formation of NJRCF and Plaintiff's transfer, assignment, and conveyance of all assets, including but not limited to, the RCF trademark, the RCF recipes, photographs, copyright, and other proprietary or promotional material. Second, the agreement designates Ms. Kolaras and Plaintiff as members of NJRCF, each with a 50/50 share of the company. Third, the agreement acknowledges that Ms. Kolaras did not receive any compensation as General Counsel of NYRCF, and in consideration for such services rendered, the agreement names Ms. Kolaras as President and General Counsel of NJRCF. Fourth, the agreement states that Ms. Kolaras' law practice does not create a conflict with her role in NJRCF and that Ms. Kolaras and Plaintiff "indemnify and hold harmless the other's business against any and all claims, losses and damages resulting from rights granted in this agreement." Fifth, the agreement acknowledges that Plaintiff "has been informed by [Ms.] Kolaras to employ independent counsel to review and explain the terms of the agreement before signing" but "failure to do so constitutes a waiver of that rights and such a decision shall not invalidate the enforcement or the validity of the agreement." The agreement bears two signatures

---

[10] Plaintiff claims the requested bill was never received. *Id.* ¶ 50.
[11] Plaintiff claims she requested a copy of the RCF Agreement from Ms. Kolaras, which was never provided. *Id.* ¶ 53.

at the end allegedly belonging to Plaintiff and Ms. Kolaras. While the RCF Agreement includes the date October 21, 2007, the signatures at the end of the agreement are not dated.

Plaintiff claims she never read or received a copy of the RCF Agreement, and therefore cannot be bound by its terms. Hughes Cert. ¶ 22. Defendants allege that Plaintiff was aware of the contents of the RCF Agreement, including the arbitration clause, and that Ms. Kolaras provided Plaintiff with a copy of the agreement for review several days before it was signed. Kolaras Reply Cert. ¶ 9. According to Ms. Kolaras, Plaintiff was advised of and acknowledged her right to consult independent counsel. *Id.* Ms. Kolaras claims Plaintiff signed other agreements around the same date as the RCF Agreement, which contained similar arbitration provisions, and that Plaintiff retained the original copy of the RCF Agreement.[12] *Id.* ¶¶ 10-12.

Following their September 30, 2009 meeting, Plaintiff alleges that she sent a letter to Ms. Kolaras on February 10, 2010, which stated her formal termination of their business relationship and requested copies of all documents relating to NJRCF, including the RCF Agreement. Compl. ¶ 59. Ms. Kolaras responded by email, notifying Plaintiff that PLK did "not have the budget to handle" Plaintiff's request for documents relating to NJRCF and therefore no such documents would be provided. Hughes Cert. Ex. M. Ms. Kolaras' email also stated that as a result of Plaintiff's termination of their business relationship, Plaintiff dissociated from NJRCF and was no longer "permitted to act on behalf of the NJ based LLC [NJRCF] or trade, discuss or otherwise engage in any way with LLC assets."[13] *Id*. Plaintiff alleges that after ending her business relationship with Defendants and dissociating from from NJRCF, "Defendants [have]

---

[12] Defendants provide as support a Purchase Agreement, a Brand Licensing Agreement, and an Acknowledgement of Services Rendered and Valid Consideration, all allegedly signed by Plaintiff. Kolaras Reply Cert. Ex. B-D. However, no defendant is a signatory any of the agreements and the Purchase Agreement is not signed. *Id.*
[13] Ms. Kolaras' email states that under "LLC Laws," each member is entitled to "a 50/50 interest" but does not mention the RCF Agreement or its terms. Hughes Cert. Ex. M.

7

engaged in the manufacture, advertisement, promotion, offer for sale and sale of desserts bearing the Plaintiffs' Marks without Plaintiffs' authorization and consent." Compl. ¶ 61.

## II. DISCUSSION

### A. Legal Standard

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., directs courts to compel arbitration of claims arising out of a valid agreement to arbitrate and reflects "the national policy favoring arbitration agreements." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). "Section 2 of the . . . FAA makes agreement to arbitrate valid, irrevocable, and enforceable, save upon such grounds as exist at law or inequity for the revocation of any contract." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1744 (2011).

Based on the strong federal policy in favor of compelling arbitration over litigation, there are two threshold questions the Court must answer when deciding a motion to compel arbitration: "(1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir. 2005). If the court determines that the dispute at hand falls within the scope of a valid arbitration agreement, "it must refer questions regarding the enforceability of the terms of the underlying contract to an arbitrator." *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 179 (3d Cir. 1999).

While the FAA "enables the enforcement of a contract to arbitrate," it also "requires that a court shall be satisfied that the making of the agreement for arbitration is not in issue before it orders arbitration."[14] *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 771 (2013). An agreement to arbitrate "is a matter of contract between the parties." *Par-Kint Mills, Inc. v.*

---

[14] "In the event that the making of the arbitration agreement is in issue, then 'the court shall proceed summarily to the trial' of that issue." *Par Knit Mills*, 636 F.2d at 54 (quoting 9 U.S.C. § 4).

8

*Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 (3d Cir. 1980). Accordingly, "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Id.* at 773. Thus, while challenges to the validity of the contract as a whole are for the arbitrator to decide, courts may hear issues which go to the formation of the agreement to arbitrate. *See Sbrmcoa, LLC v. Bayside Resort, Inc.,* 707 F.3d 267, 271 (3d Cir. 2013).

In deciding whether the making of an agreement to arbitrate is in issue, courts evaluate motions to compel arbitration using either the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the motion for summary judgment standard under Federal Rule of Civil Procedure 56.[15] *Guidotti,* 716 F.3d at 771. When determining which standard to use, courts must first decide whether "the affirmative defense of arbitrability of claims is apparent on the face of a complaint or documents relied upon in the complaint." *Id. at* 764 (citing *Somerset Consulting, LLC v. United Capital Lenders, LLC,* 832 F. Supp 2d 474, 479 (E.D.Pa. 2011)). If it is "apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard'" without further discovery.[16] *Id.* at 771. (quoting *Somerset*, 832 F. Supp. 2d at 482). However, if "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," then "applying a rule 12(b)(6) standard is inappropriate." *Id.* at 775 (internal citations and quotations omitted).

---

[15] Deciding which standard to use "is of utmost importance because the two standards differ in significant ways." *Guidotti,* 716 F.3d at 772.

[16] Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim should be granted "only if, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, [the court] determine[s] that the plaintiff is not entitled to relief under any reasonable reading of the complaint." *McGovern v. City of Phila.,* 554 F.3d 114, 115 (3d Cir. 2009).

Accordingly, if the court determines that "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties are entitled to 'discovery on the question of arbitrability before a court entertains further briefing on [the] question.'" *Id.* at 776. (quoting *Somerset*, 832 F. Supp. 2d at 482). Then, after limited discovery on the issue of arbitrability, "the court may entertain a renewed motion to compel" using the standard for summary judgment.[17] *Id.*

**B. Analysis**

Defendants bring their motion to dismiss pursuant to the arbitration provision in the RCF Agreement under Rule 12(b)(6), or in the alternative, under Rule 56. Plaintiff asserts that despite the signature appearing to belong to her at the end of the RCF Agreement, she had never seen the document and was unaware of its contents and arbitration provision until Defendants filed it with the Court. Plaintiff argues that she did not agree to, and therefore cannot be bound by the RCF Agreement because was "no meeting of the minds on the agreement to arbitrate." *Guidotti,* 716 F.3d at 777.

Defendants correctly argue that a challenge the validity of the overall contract, as opposed to a challenge to its formation, must be decided by the arbitrator. *See Buckeye Check Cashing, Inc.,* 546 U.S. 440 at 449 ("a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go the arbitrator."). However, Defendants also acknowledge that a question as to whether an agreement to arbitrate was ever concluded, such as "whether Plaintiff's signature is a forgery, might present an issue for the Court's determination." Def. Br. at 10. While the parties make several arguments about the overall validity of the RCF

---

[17] Pursuant to Federal Rule of Civil Procedure 56, "a court shall grant summary judgment if the moving party shows that there is no genuine issue of material fact."

Agreement, which must be decided by an arbitrator, the Court must make an initial determination as to whether an agreement to arbitrate was formed between the parties. *See Granite Rock Co. v. Int'l Bhd. of Teamsters,* 130 S.Ct. 2847, 2855 (2010) ("It is well settled . . . that whether parties have agreed to submi[t] a particular dispute to arbitration is typically an issue for judicial determination").

Defendants claim that Plaintiff read and retained the original RCF Agreement and argue that unless Plaintiff "clearly and unequivocally denies under oath that she signed the [RCF] Agreement, the action should be dismissed." Def. Br. at 10. In *Guidotti*, the plaintiff, despite her signed acknowledgment of an agreement containing an arbitration provision, argued that she did not agree to, and could not be bound by the arbitration provision "because she did not see [the arbitration provision] at the time she agreed to the contract and there was no meeting of the minds of the agreement to arbitrate." *Guidotti,* 716 F.3d at 777. The Third Circuit held that even without a sworn affidavit, the plaintiff had presented sufficient evidence to question whether there had been "a 'meeting of the minds' on the terms and conditions contained in the [contract]," and therefore, "the District Court should not have [decided] the ... motion to compel arbitration without first allowing limited discovery and then entertaining [the] motion under a summary judgment standard." *Guidotti,* 716 F.3d at 778-80.

In the present case, Plaintiff has presented sufficient evidence to question whether there was a meeting of the minds on the terms in the RCF Agreement, including the agreement to arbitrate. Plaintiff does not concede the authenticity of the RCF Agreement presented by Defendants and identifies various inconsistencies in the document.[18] Defendants argue that Plaintiff was given ample opportunity to review the agreement and offer three other agreements

---

[18] Plaintiff notes that the RCF Agreement, "which is a single spaced document with no headings to guide the reader," includes the incorrect legal name and address of the company it purports to transfer ownership of. Pl. Reply Br. at 2-3.

allegedly signed by Plaintiff on the same day as the RCF Agreement as evidence of Plaintiff's awareness of the contents of the RCF Agreement. However, the Court notes that Ms. Kolaras is not a party to any of the other three agreements, one of the agreements is not signed, and the agreements that are signed bear a date next the signatures, unlike the RCF Agreement, in which there is no date included in the signature line. Accordingly, the Court finds that Plaintiff's denial of the creation of the RCF Agreement, even though it appears to contain her signature, is more than a mere "naked assertion" that she "did not intend to be bound by the terms" of the agreement. *Par-Knit Mills,* 636 F.2d at 55 (holding that a party's mere "naked assertion" that they "did not intend to be bound" is "insufficient to place in issue the making of the arbitration agreement").

Plaintiff's Complaint does not suggest that the claims contained therein are subject to an arbitration agreement, and Defendants concede that an agreement to arbitrate is not clear on the face of the Complaint. *See* Def. Br. at 9 (stating "Defendants have put the Agreement—that contains the controlling arbitration provision—before the Court"). Therefore, in light of Plaintiff's claim that she did not receive or intend to be bound by the provisions of in the RCF Agreement, and because arbitrability is not apparent on the face of the Complaint, Defendants' motion to dismiss "must be denied pending further development of the factual record." *See Guidotti,* 716 F.3d at 774. After limited discovery on the issue of arbitrability, the Court "may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." *Id.* at 776.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is DENIED without prejudice. The Court will allow Defendants to renew the Motion to Dismiss under a summary judgment standard after relevant discovery has occurred. An appropriate Order accompanies this Opinion.

Date: October 28, 2013   /s/ Joel A. Pisano  
JOEL A. PISANO  
United States District Judge